

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00121-CV

IN THE INTEREST OF R.A.E.,
M.A.E., A.M.E., D.A.S., B.G.S.,
AND B.A.E., MINOR CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

In four issues, Appellant S.S. (Mother) appeals from the trial court's order terminating her parental rights to her children, R.A.E., M.A.E., A.M.E., D.A.S., B.G.S., and B.A.E (collectively, the "children"). In one issue, Appellant M.E. (Father) appeals from the trial court's order terminating his parental rights to his children, R.A.E., B.G.S., and B.A.E. We will affirm both appeals.

------------

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

R.A.E. was born in March 2000, M.A.E. was born in March 2003, A.M.E. was born in May 2004, D.A.S. was born in May 2006, B.G.S. was born in April 2007, and B.A.E. was born in March 2009. At the time of the final termination trial in March 2010, R.A.E. was ten years old, M.A.E. was seven years old, A.M.E. was five years old, D.A.S. was three years old, B.G.S. was two years old, and B.A.E. was almost one year old. Father is the alleged biological father of only R.A.E., B.G.S., and B.A.E. M.A.E.'s, A.M.E.'s, and D.A.S.'s alleged fathers are unknown.[2]

CPS conducted the following investigations involving Mother, Father, some or all of the children, or all of them:

•July 1, 1999 Report and Investigation. This report concerned sexual abuse of Mother's two other children, "Billy" and "Jake,"[3] who are not the subject of this termination suit. The report, which was "ruled out," stated that Mother and her "possible roommate" had grabbed the boys' genitals.

•September 30, 2000 Report and Investigation. This report concerned neglectful supervision of R.A.E. by Mother and Father. The report, which was ruled "unable to determine," stated that Father had thrown Mother's possessions

---

[2]Father and Mother each have several other children that were not the subject of the termination suit.

[3]We use aliases to refer to these two children. *See* Tex. R. App. P. 9.8(b)(2).

out of the house after an argument, that Mother was addicted to drugs, and that Father had taken her to get drugs.

•March 20, 2001 Report and Investigation. This report concerned neglectful supervision and physical neglect of R.A.E. and Jake by Mother. The report, which was ruled "unable to determine," alleged that Mother had tested positive for cocaine during a hospitalization for gastroenteritis and that the children were filthy.

•July 2, 2001 Report and Investigation. This report concerned sexual abuse of R.A.E. by an unknown person. The report, which was ruled "unable to complete" because the family had moved, alleged that Mother had called a nurse hotline and reported that she had found blood and pubic hair in R.A.E.'s stool.

•May 13, 2004 Report and Investigation. This report, which was ruled "reason to believe for physical abuse," concerned physical abuse of A.M.E. by Mother because Mother had tested positive for cocaine when she went to the hospital to deliver A.M.E. A.M.E. and a sibling were voluntarily placed with their maternal grandmother.

•May 5, 2006 Report and Investigation. This report concerned physical abuse of D.A.S. by Mother because both D.A.S. and Mother had tested positive for cocaine at D.A.S.'s birth. R.A.E., M.A.E., A.M.E., and D.A.S. were voluntarily placed with their maternal grandmother. In June 2006, R.A.E., M.A.E., A.M.E., and D.A.S. were removed and placed in foster care because the maternal grandmother had allowed Mother unsupervised contact with several of the

3

children and because D.A.S. had been taken to the emergency room and admitted to the ICU after being given too much water. The report was ruled "reason to believe."

Jessica Puryear began working with Mother and Father as their caseworker in June 2006. The service plan required Mother, who admitted that she had a drug problem with cocaine, to perform drug treatment and both Mother and Father to take random drug tests, complete individual therapy, complete parenting classes, take psychological evaluations, and achieve financial stability. Mother initially visited the children, but she showed up intoxicated or under the influence of something in June 2006 and did not return for any visits until October 2006, when she told Puryear that she had been out of town with friends, had moved in with her mother, and was ready to begin her services. Mother eventually completed individual therapy, parenting classes, anger-management classes, and outpatient drug rehabilitation; tested negative for drugs in October and December 2006 and in February and April 2007; was employed by the zoo; and lived with her mother, an appropriate home. Both Mother and B.G.S. tested negative for drugs at B.G.S.'s birth in April 2007. In light of this and several other things, CPS reunified the children with Mother and Father and closed the case in September 2007. Puryear informed Mother at that time that this was "the last chance for her based on her history and that she really needed to keep her sobriety and not relapse."

4

•November 7, 2006 Report and Investigation.  This report originated during CPS's investigation of the May 5, 2006 report and concerned sexual abuse of R.A.E. by her brother, Billy, and neglectful supervision of R.A.E. by her maternal grandmother.  The report alleged that then six-year-old R.A.E. outcried that Billy had sexually abused her and was ruled "reason to believe" for sexual abuse and for neglectful supervision.[4]

•April 5, 2007 Report and Investigation.  This report also originated during CPS's investigation of the May 5, 2006 report and concerned neglectful supervision of B.G.S. by Mother.  Ultimately "ruled out," the report alleged that Mother had not received any prenatal care before going into labor with B.G.S., and the hospital's records showed that Mother had tested positive for illegal drugs in May 2004 and May 2006.

•June 27, 2008 Report and Investigation.  This report concerned sexual abuse of R.A.E. by two boys.  R.A.E. had outcried that the two boys had touched her vaginal area.  There was also an allegation that Mother was gone for days at a time.  The report was ruled "reason to believe" for one boy and "ruled out" for the other.

•November 10, 2008 Report and Investigation.  This report concerned neglectful supervision of R.A.E., M.A.E., A.M.E., D.A.S., and B.G.S. by Mother and sexual abuse of R.A.E.  The allegations were that Mother had been disappearing for two to three days at a time and that R.A.E. was acting out at

---

[4]Billy was sent to TYC for the sexual abuse of R.A.E.

school. The neglectful supervision allegation was "ruled out," and the sexual abuse allegation was "closed administratively due to the previous investigation for the sexual abuse."

•March 25, 2009 Report and Investigation. CPS employee Sharla Lawless received a referral concerning Mother's previous drug use and history with CPS. B.A.E. had just been born, and because both she and Mother had tested negative for drugs, Lawless had no immediate concerns about Mother using illegal drugs. Mother told Lawless that she had not used drugs in a year and a half, and Father said that he was not working but that he sometimes sold goods from Mexico in the United States. Lawless did not have any concerns at that point that the children needed to be removed.

•May 11, 2009 Report and Investigation. This report originated because A.M.E. was not picked up on time from pre-kindergarten. School officials were unable to contact Mother or any other family members, and school officials told Mother, who showed up over two hours late, that they would take the child to All Church Home if she failed to pick him up on time again.

•May 19, 2009 Report and Investigation. This final report originated after M.A.E. was taken to All Church Home because no one picked him up from school on May 18, 2009. The person listed as M.A.E.'s grandmother said that she was not M.A.E.'s grandmother and that she would not pick up M.A.E. Father told school officials that he did not know where Mother was and that he would not pick up M.A.E.

6

On May 19, 2009, Lawless went to a house on Jones Street—where Mother, Father, and the children lived—and met with Mother. Mother initially told Lawless that she did not pick up M.A.E. from school on May 18, 2009, because she was at a car title loan business. Mother also denied that she had used illegal drugs, and she told Lawless that there was a person who had been staying in a shed in the backyard; that she had cleaned up that area and found cocaine residue, cocaine baggies, and glass pipes; and that she did not know that the person had been using illegal drugs until he moved out. Lawless, however, gave Mother an oral swab drug screen that tested positive for cocaine, and Mother proceeded to admit to Lawless that she had used cocaine with a friend on May 18, 2009.

Mother gave Lawless permission to view the house. In the front yard, Lawless observed that part of the house's siding was coming off, that a gas can was accessible to the children, that several dirty diapers were present, and that several flies and bugs were around the area. In the backyard, Lawless observed two seemingly aggressive dogs that were tied up and several metal, hazardous items that she thought were concerning for a small child to be around. In the living room, Lawless observed that the bed where A.M.E., M.A.E., and B.G.S. slept appeared to be soiled and had flies on it. Lawless described the condition of the bedroom where R.A.E. and D.A.S. slept as "cluttered" with clothes "everywhere" and "hazardous" for a small child to walk through. In the hallway, Lawless saw that the floor could be easily tripped on because parts of it were

7

"up" and missing. Lawless did not see a crib for B.A.E., and she was concerned that the house, which had a strong smell of urine, did not have electricity because she observed an extension cord running into the house and did not see light fixtures in any of the rooms. Regarding the kitchen, Lawless testified,

> The concern there was there were no actual walls on the inside. It was just the studs and you could see the live wire and the plug-in with the wire going up. Also the stove was in there. I didn't see a sink in the kitchen area, but I did see the stove and it had several . . . different pots and pans with what appeared to be old food. And that area was covered in flies and there was a significant amount [of] roaches in that area.

When Lawless expressed her concerns about the house, Mother said that she and Father were remodeling it.

M.A.E., D.A.S., B.G.S., and B.A.E. were at the house during Lawless's visit and appeared to be "very dirty" and had an odor as if they had not been bathed recently. B.A.E.'s "onesie" was "very dirty" and smelled of urine, and she had a severe diaper rash with blisters on her skin.

Lawless also spoke with Father about M.A.E. being left at school, and Father said that he thought Mother was using cocaine on May 18, 2009, because her behavior reflected a pattern of what she did when she used illegal drugs. Father confirmed that he was not working and that he could not purchase the materials needed to repair the house.

Lawless expressed her concerns to Mother and Father about the safety of the children after visiting the house and later met with Mother, Father, and the children at her office to inquire about finding someone to place the children with.

8

When no one could be located, CPS removed the children from Mother's and Father's care. All six children, including B.A.E., had head lice. The children were taken to a group foster home on May 27, 2009, and were still living there at the time of the final trial. CPS ruled "reason to believe" for neglectful supervision of the children by Mother because she had tested positive for cocaine, had admitted using cocaine, had admitted that she "used alcohol" and was "under the influence" when she picked up one of the children from school on one occasion, and had an extensive history with CPS. CPS ruled "reason to believe" for physical neglect of the children by Father based on the condition of the house and the children.

CPS employee Oneeka Chilton took over Mother's and Father's case from Lawless and developed service plans for both of them. Mother initially visited the children, kept in contact with Chilton, and set up several services, but she did not attend and complete all of the services, and Chilton lost contact with her from July 2009 to October 2009. When Mother made contact with Chilton in October 2009, Mother told Chilton that she had last used illegal drugs in late September 2009 and that she was ready to begin working her service plan. Chilton referred Mother to Recovery Resource in October 2009, and Mother subsequently successfully completed a seven-day detox and inpatient drug program there and then a twenty-eight-day inpatient treatment program at Pine Street. Recommendations were made that Mother continue aftercare group sessions,

9

attend Narcotics Anonymous (NA) and Alcoholics Anonymous (AA), and get a sponsor.

In early March 2010, Chilton visited the house on Jones Street, where Father still lived. She had concerns about the house because there was no drywall in certain areas (although there was drywall lying on the floor that had not yet been installed); there was a hole at the top of the bathroom wall above the toilet; there was debris, trash, junk, and barbed wire in the backyard; there was only one bed; and there was no carpet.

At trial, Chilton expressed concerns that Mother had not provided her with documentation that she had a sponsor and that Mother had not continued to provide her with documentation that she was attending NA and AA, but Mother testified that she did have a sponsor, that she had been attending NA and AA, and that she has a large support group. Chilton did not know that Mother had been arrested within thirty days of entering detox. On January 28, 2010, Mother took a hair-strand drug test that was positive for high levels of cocaine. Chilton expressed concern about the results because Mother's levels should have been very low, if any, given that she had reported last using cocaine in late September 2009. Chilton was also concerned because the children kept returning from visits with Mother with lice, and Chilton had concerns that Mother could relapse if the children were returned to her care and that Mother could not maintain a safe house and a stable environment. Chilton testified that the trial court should terminate Mother's parental rights to the children and Father's parental rights to

10

R.A.E., B.G.S., and B.A.E. and that termination would be in the children's best interests.

At the time of trial, Mother lived at the Union Gospel Mission, where she participated in several programs. She claimed that her sobriety date was December 3, 2009, and that she did not know how the January 2010 drug test was positive but that "[t]here was something in my drink." Mother opined that the children could live with her at the Union Gospel Mission while she finished several services and secured housing. She acknowledged that she did not "have enough clean time to get all six kids back" and asked the trial court "to give [her] a little bit more time . . . to get [her] housing so [she] can be stable." Mother said that she was no longer in a relationship with Father and that she did not know who M.A.E.'s or A.M.E.'s father was.[5]

Father refused to perform his service plan from June 2009 until March 2010, the month of the final trial. He took a hair-strand drug test on March 8, 2010, that was positive for cocaine and another drug test on March 20, 2010, that was positive for cocaine.

On April 16, 2010, the trial court signed an order terminating Mother's parental rights to the children and Father's parental rights to R.A.E., B.G.S., and B.A.E. The trial court found by clear and convincing evidence that both Mother and Father had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-

---

[5]Chilton testified that D.A.S.'s father is also unknown.

11

being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being; and (3) constructively abandoned the children. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N) (Vernon Supp. 2010). The trial court also found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the children's best interests. *See id.* § 161.001(2). Mother and Father filed their notices of this appeal.

### III. BURDEN OF PROOF AND STANDARD OF REVIEW

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the

12

parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2010); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2010), §161.206(a) (Vernon 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were

13

proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provisions of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

14

reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. EVIDENTIARY SUFFICIENCY OF ENDANGERMENT FINDINGS

In her first and second issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's family code subsection 161.001(1)(D), (E), and (N) endangerment findings.

Endangerment means to expose to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(D). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *J.T.G.*, 121 S.W.3d at 125.

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. Tex. Fam. Code Ann.

15

§ 161.001(1)(E). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *Id.*; *In re D.M.*, 58 S.W.3d 801, 812–13 (Tex. App.—Fort Worth 2001, no pet.). A factfinder may also infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.).

Parental and caregiver illegal drug use supports a conclusion that the child's surroundings endanger his physical or emotional well-being. *J.T.G.*, 121

16

S.W.3d at 125; *S.D.*, 980 S.W.2d at 763; *M.M.*, 2008 WL 5195353, at *6 (stating that drug use and its effect on a parent's life and that parent's ability to parent may establish an endangering course of conduct). Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being. *J.T.G.*, 121 S.W.3d at 133.

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review. *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *J.T.G.*, 121 S.W.3d at 126. The evidence demonstrates that CPS has conducted numerous investigations involving Mother or some or all of the children, including one investigation in 1999, one investigation in 2000, two investigations in 2001, one investigation in 2004, two investigations in 2006, one investigation in 2007, two investigations in 2008, and three investigations in 2009. The September 2000, March 2000, May 2004, and May 2006 investigations involved allegations that Mother used illegal drugs, and several exhibits entered into evidence showed that Mother tested positive for cocaine when both A.M.E. and D.A.S. were born and that cocaine was "detected" in both A.M.E. and D.A.S when they were born. Mother admitted using illegal drugs in May 2009 and late September 2009, and she tested positive for cocaine in January 2010, exhibiting high levels of cocaine just two months before the final termination trial. One of Mother's medical records, dated October 2009, notes that she reported "that she used to smoke crack about

17

every other day, but she stopped on her own about 1 month ago," which would have been in September 2009, well after the children had been removed from her care. In 2009, although Mother claimed that the items belonged to someone else, she told Lawless that she had found cocaine residue, cocaine baggies, and glass pipes in the backyard shed at the Jones Street residence. The children were living there at the time. Notwithstanding the concerning condition of the house located on Jones Street, Mother's illegal drug use in May 2009—after the children had already been removed once for her illegal drug use in May 2006—was a major factor that led CPS to remove the children from her care for a second time; CPS had warned Mother after she was reunited with the children in 2007 that this was her last chance and that she needed to remain sober. But Mother resumed a continuing course of illegal drug use that has spanned years—actions that subjected each of the children, including the youngest child, B.A.E., to a life of uncertainty and instability, endangering their physical and emotional well-being. *See J.T.G.*, 121 S.W.3d at 125, 133; *S.D.*, 980 S.W.2d at 763; *M.M.*, 2008 WL 5195353, at *6.

Accordingly, giving due deference to the trial court's findings, we hold that a reasonable trier of fact could have formed a firm belief or conviction that Mother engaged in conduct or knowingly placed or knowingly allowed the children to remain in conditions that endangered their physical or emotional well-being. *See* Tex. Fam. Code. Ann. § 161.001(1)(D), (E). We hold that the evidence is legally and factually sufficient to support the trial court's environmental or course-of-

18

conduct endangerment findings. We overrule Mother's first issue. Having overruled Mother's first issue, we need not address—and therefore overrule—her second issue challenging the sufficiency of the evidence to support the trial court's subsection 161.001(1)(N) finding. *See* Tex. R. App. P. 47.1; *J.L.*, 163 S.W.3d at 84 (stating that parent must have committed only one of the acts prohibited under family code section 161.001(1) for termination of her parental rights).

## V. EVIDENTIARY SUFFICIENCY OF BEST INTEREST FINDINGS

In her third issue, Mother argues that the evidence is factually insufficient to support the trial court's family code section 161.001(2) best interest finding. In his only issue, Father argues that the evidence is factually insufficient to support the trial court's best interest finding.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *R.R.*, 209 S.W.3d at 116. Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008) (listing factors that should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody;

19

(E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases, and other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interest of the child. *Id.* at 28.

### A. Mother

We have already detailed above the evidence demonstrating Mother's continuing course of illegal drug use and the high number of CPS referrals, which is probative in addressing the best interest inquiry. *See id.* Although Mother successfully performed various services in 2006 and 2007 aimed at overcoming her drug use and improving her parenting skills, she eventually regressed and returned to using illegal drugs, disappearing for days at a time in 2008 and

20

neglecting to pick up M.A.E. and A.M.E. from school in May 2009. According to Lawless, Father recognized that Mother's behavior reflected a "pattern" of how she acted when she used illegal drugs. Indeed, Mother's January 28, 2010 hair-strand drug test—taken after she had completed drug treatment in December 2009—exhibited high levels of cocaine. Chilton testified that she had concerns that Mother could relapse if the children were returned to her care and about whether Mother could maintain a safe house and a stable environment.

Mother had the opportunity to begin working her service plan months before October 2009, but she stated that she did not do so because she lived in a van and was "going through a hard time," according to Chilton. At the time of trial, Mother lived at the Union Gospel Mission, where she was participating in several services. In the event the children were returned to Mother, Chilton expressed concern about who would supervise the children at the Union Gospel Mission while Mother participated in her classes and services. At trial, Mother acknowledged that she did not have enough "clean time to get all six kids back today" and said that she wanted to have the children returned to her at "some date."

A March 2010 CASA report stated that the children are clean and appropriately dressed, that they are attached to the foster parents and thriving in the structured environment, and that their medical and dental checkups and immunizations are current. It also stated that "[a]lthough the children love their parents, all exhibit negative behavior after CPS parent visits, with the exception

21

of B.A.E. After two of the visits, the children had lice eggs in their hair. The source of this infestation was not determined." The foster home is not "adoption motivated," however.

Considering the relevant statutory factors in evaluating Mother's willingness and ability to provide the children with a safe environment and the relevant *Holley* factors, we hold that, in light of the entire record, and giving due consideration to evidence that the trial court could have reasonably found to be clear and convincing, the trial court could reasonably have formed a firm belief or conviction that termination of Mother's parental rights to the children is in the children's best interests. Accordingly, the evidence is factually sufficient to support the trial court's family code section 161.001(2) best interest finding. We overrule Mother's third issue.

## B. Father

The evidence demonstrates that Father was aware of Mother's drug problem as early as September 2000, when CPS investigated allegations that Mother was addicted to drugs and that Father had taken her to get drugs. Although Father knew about Mother's continuing illegal drug use and even recognized her behavior when she used illegal drugs, he permitted R.A.E., and later B.G.S. and B.A.E., to remain in her care and in that environment. Father does not challenge the trial court's family code subsection 161.001(1)(D), (E), or (N) findings.

Father refused to perform his service plan from June 2009 until the month of the final trial. Although several services were put in place, there is no evidence that Father initiated and completed any services. Father tested positive for cocaine on March 8, 2010, and again on March 20, 2010. The March 2010 CASA report indicated that it is not known whether Father is employed and that he had only visited the children twice, once in July 2009 and once in March 2010.

Chilton visited the house on Jones Street where Father lives and had several concerns about it—drywall was missing in certain areas; there was a hole at the top of the bathroom wall above the toilet; debris, trash, junk, and barbed wire were in the backyard; there was only one bed; and there was no carpet.

Father argues that this case is like *In re W.C.*, a case in which this court held that the evidence was factually insufficient to support the trial court's best interest finding. 98 S.W.3d 753, 766 (Tex. App.—Fort Worth 2003, no pet.). But this case is unlike *W.C.* because the mother in that case, unlike Father here, complied with almost all of her service plan, visited her children regularly, maintained suitable employment, lived in her own suitable apartment, and "made 'significant progress in alleviating the causes for the children's removal from her home,'" among other things. *Id.* at 765.

Considering the relevant statutory factors in evaluating Father's willingness and ability to provide R.A.E., B.G.S., and B.A.E. with a safe environment and the relevant *Holley* factors, we hold that, in light of the entire record, and giving due consideration to evidence that the trial court could have reasonably found to be

23

clear and convincing, the trial court could reasonably have formed a firm belief or conviction that termination of Father's parental rights to R.A.E., B.G.S., and B.A.E. is in R.A.E., B.G.S., and B.A.E.'s best interests. Accordingly, the evidence is factually sufficient to support the trial court's family code section 161.001(2) best interest finding. We overrule Father's only issue.

## VI. INEFFECTIVE ASSISTANCE

In her fourth issue, Mother argues that her counsel rendered ineffective assistance at trial because he failed to file discovery, failed to vigorously cross-examine witnesses and make a closing argument, and failed to object to the introduction of Mother's drug test results.

There is a right to effective assistance of counsel in a termination case. *In re M.S.,* 115 S.W.3d 534, 544 (Tex. 2003). We review ineffective assistance claims under the *Strickland* standard. *Id.* at 549. To establish ineffective assistance of counsel, appellant must show by a preponderance of the evidence that her counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

24

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *Salinas*, 163 S.W.3d at 740; *Mallett*, 65 S.W.3d at 63. A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim. *Thompson*, 9 S.W.3d at 813–14. "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Salinas*, 163 S.W.3d at 740 (citing *Mallett*, 65 S.W.3d at 63). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (quoting *Thompson*, 9 S.W.3d at 813). It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

As a general rule, we do not speculate about trial counsel's strategy. *Blevins v. State*, 18 S.W.3d 266, 271 (Tex. App.—Austin 2000, no pet.). We will not second-guess through hindsight the strategy of counsel at trial. *Blott v. State*,

588 S.W.2d 588, 592 (Tex. Crim. App. 1979). In the absence of direct evidence in the record of counsel's reasons for the challenged conduct, an appellate court will assume a strategic motivation if any can be imagined. *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001), *cert. denied*, 537 U.S. 1195 (2003).

Here, Mother's motion for new trial does not raise ineffective assistance, nor does the record contain any post-trial hearing in which Mother raised ineffective assistance. Nor can we conclude that this is one of those rare cases in which the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Garcia*, 57 S.W.3d at 440). Accordingly, based on the record before us, in light of the strong presumption of reasonable professional assistance by trial counsel, and in the absence of any opportunity for trial counsel to explain his motives, we cannot conclude that Mother met her burden of showing by a preponderance of the evidence that her trial counsel's representation fell below the standard of prevailing professional norms. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065. Consequently, Mother has failed to satisfy the first prong of the *Strickland* test. We overrule Mother's fourth issue.

## VII. CONCLUSION

Having overruled Mother's four issues, we affirm the trial court's order terminating the parent-child relationship between Mother and R.A.E., M.A.E., A.M.E., D.A.S., B.G.S., and B.A.E. Having overruled Father's sole issue, we

26

affirm the trial court's order terminating the parent-child relationship between Father and R.A.E., B.G.S., and B.A.E.

BILL MEIER
JUSTICE

PANEL: GARDNER, WALKER, and MEIER, JJ.

DELIVERED: February 17, 2011